******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AMARAL BROTHERS, INC. *v.*
DEPARTMENT OF LABOR
(SC 19622)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued December 12, 2016—officially released April 4, 2017*

*Melinda A. Powell*, with whom was *Robin B. Kallor*, for the appellant (plaintiff).

*Gregory T. D'Auria*, solicitor general, with whom were *Krista D. O'Brien* and *Thomas P. Clifford III*, assistant attorneys general, and, on the brief, *George Jepsen*, attorney general, and *Philip M. Schulz*, assistant attorney general, for the appellee (defendant).

*Opinion*

McDONALD, J. General Statutes § 31-60 (b) carves out certain exceptions to Connecticut's minimum wage laws. Among other things, § 31-60 (b) directs the Labor Commissioner, acting through the defendant, the Department of Labor, to adopt regulations that recognize that employers may include gratuities as part of the minimum fair wage for employees in the restaurant and hotel industries who customarily and regularly receive gratuities (tip credit). The primary question raised by this appeal is whether the department's regulations, which limit the tip credit to bartenders and traditional waitstaff and do not allow employers to count gratuities toward the minimum wage for other employees such as restaurant delivery drivers, conflict with the enabling statute. Because we conclude that the regulations are not incompatible with § 31-60 (b), we affirm the judgment of the trial court dismissing the appeal of the plaintiff, Amaral Brothers, Inc., from the commissioner's declaratory ruling that the plaintiff's drivers are not subject to a tip credit.

The following undisputed facts and procedural history are relevant to our disposition of this appeal. The plaintiff is a Connecticut corporation that operates Domino's pizza franchises in Groton and Mystic. The plaintiff employs approximately forty drivers who deliver food items to customers' homes. The drivers own and maintain their vehicles, but the plaintiff reimburses them for travel expenses. The drivers commonly receive gratuities from customers and are required to report their gratuities on an electronic system that the plaintiff maintains.

In 2013, the plaintiff filed a petition for a declaratory ruling with the commissioner seeking a determination that it could pay a reduced minimum wage to its delivery drivers because they regularly receive gratuities that, on average, result in the drivers earning in excess of the minimum wage. The plaintiff relied on § 31-60 (b), which provides in relevant part that the commissioner "shall adopt such regulations . . . as may be appropriate to carry out the purposes of this part. Such regulations . . . shall recognize, as part of the minimum fair wage, gratuities in an amount . . . equal to [a] per cent of the minimum fair wage per hour for persons, other than bartenders, who are employed in the hotel and restaurant industry . . . who customarily and regularly receive gratuities . . . ." The plaintiff also challenged the validity and application of department regulations that distinguish between service employees, for whom restaurant industry employers can apply a tip credit and pay the reduced minimum wage, and nonservice employees, who must receive the full minimum wage. See Regs., Conn. State Agencies §§ 31-62-E1 through 31-62-E4.

The commissioner issued a declaratory ruling finding that the exclusion of restaurant employees other than waitstaff from the application of the tip credit regulations was valid. The commissioner observed, among other things, that (1) the regulations had been the subject of prior unsuccessful legal challenges, and (2) the regulations are consistent with the notion that the minimum wage law is a remedial statute that should receive a liberal construction to accomplish its purpose of ensuring the payment of fair and just wages. The commissioner also noted that exceptions to rules such as the minimum wage requirement must be narrowly construed and that a petitioner seeking to declare an administrative regulation invalid bears a heavy burden.

Having determined that the department's tip credit regulations did not contravene the enabling statute and were not arbitrary or invalid, the commissioner then considered the question whether delivery drivers satisfy the regulatory definition of restaurant service employees for whom a credit may be taken. In relevant part, the regulations define a service employee as "any employee whose duties relate solely to the serving of food and/or beverages to patrons seated at tables or booths, and to the performance of duties incidental to such service, and who customarily receives gratuities. . . ." Regs., Conn. State Agencies § 31-62-E2 (c). The commissioner determined that the plaintiff's delivery drivers perform various on the road duties that fail to satisfy this definition in two respects: "While the drivers are clearly not delivering food to patrons [sitting] at tables or booths, the [department] finds that the regulation is inapplicable primarily because the majority of the specific duties performed by the drivers do not relate *solely* to the serving of food . . . and to the performance of duties incidental to such service . . . within the meaning of the regulation."[1] (Emphasis in original; footnote omitted; internal quotation marks omitted.) The commissioner rejected the plaintiff's theory that a driver transporting pizza from a Domino's restaurant to a customer's location is comparable to a server carrying food from a restaurant kitchen to a customer's table. Rather, she found that "only the solitary act of transferring possession of food from a driver's vehicle to a customer at the doorway of a home is analogous to . . . [the] serving of food . . . ." (Internal quotation marks omitted.) Drivers' other on the road duties—everything from driving and navigating to vehicle and license maintenance to remote communications with the employer—were deemed to be materially different from the service functions performed by traditional waitstaff while serving food to patrons within the confines of a restaurant.

The commissioner also found that pizza delivery drivers differ from traditional waitstaff in ways that may impair their capacity to earn gratuities. For example, drivers do not have an opportunity to establish a rapport

with customers by taking the initial order, providing status updates, checking periodically on customer satisfaction and needs, or cleaning the service area. Rather, the sole interaction with the customer is the brief exchange of food and payment at the time of delivery. Noting that "the interaction between the driver and the customer is minimal in duration and quality," the commissioner concluded that "the [on the road] functions possess none of the characteristics customarily associated with the complement of services provided by waitstaff in a restaurant." Finally, the commissioner found relevant the fact that, whereas the waitstaff has the opportunity to earn gratuities continuously by servicing multiple tables at once, a delivery driver can earn gratuities from at most one customer at a time and must frequently return to the restaurant for additional assignments, during which time no gratuities can be earned.[2]

Consistent with these findings, the commissioner concluded that there is a rational basis for distinguishing between delivery drivers and restaurant service employees and, therefore, declined to invalidate the department's regulations as applied to the plaintiff. The commissioner also declined the plaintiff's request to amend the regulations or to promulgate new ones. As a result of the ruling, the plaintiff is unable to take a tip credit and pay its drivers a reduced minimum wage.

The plaintiff took an administrative appeal of the commissioner's decision to the trial court pursuant to General Statutes § 4-183. The plaintiff claimed that the department acted in an arbitrary and capricious manner and abused its discretion by, among other things: (1) adopting regulations that distinguish between service and nonservice duties in a manner that is not authorized by, and is inconsistent with, the enabling statute, § 31-60 (b); (2) concluding that a driver is only performing service related duties during the time that he or she leaves his or her vehicle to walk the food to the customer's door; and (3) making findings as to the nature of food delivery versus waitstaff work that were not supported by the record. The court, *Schuman*, *J.*, concluded that the challenged regulations are valid and that the plaintiff's drivers do not satisfy the regulatory definition of service employees. Accordingly, the court affirmed the decision of the commissioner and dismissed the plaintiff's appeal.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. On appeal, the plaintiff contends that the department's tip credit regulations, as applied to the plaintiff's delivery drivers, are not authorized by § 31-60 (b), and that the trial court should not have deferred to the department's interpretation of the statute. We affirm the judgment of the trial court

dismissing the plaintiff's administrative appeal.

In most instances, the party challenging the validity of an administrative regulation claims that the regulation was inconsistent with an authorizing statute or beyond the legislature's grant of authority to the agency *at the time the regulation was issued. Dugas* v. *Lumbermens Mutual Casualty Co.*, 217 Conn. 631, 640, 587 A.2d 415 (1991). The present case is different. Here, the plaintiff concedes that the relevant regulations; Regs., Conn. State Agencies § 31-62-E1 et seq.; were valid when the department first promulgated them but contends, in essence, that they were repealed by implication by a subsequent amendment of the enabling statute.

We thus begin our analysis by reviewing the history of Connecticut's tip credit laws. The distinction between service and nonservice restaurant employees, as well as the rule that the former can be paid a lower minimum wage than the latter, traces its origins to regulations adopted by the former Department of Labor and Factory Inspection in 1950, before the legislature had authorized a formal tip credit. See Dept. of Labor and Factory Inspection, Mandatory Order No. 4A, § 180-6-1, 16 Conn. L.J., No. 73, p. 5 (March 28, 1950) (establishing minimum wages for women and minors employed as service and nonservice employees in restaurant occupations).[3] Those regulations defined a service employee as "any employee whose duties relate solely to the serving of food and/or beverage to patrons seated at tables or booths, and to the performance of duties incidental to such service, and who customarily receives gratuities." Id., § 180-6-13, p. 6. A nonservice employee, by contrast, was defined as "an employee other than a service employee, as herein defined. A non-service employee shall include, but is not limited to, countergirls, counterwaitresses and those employees serving food or beverage to patrons seated at tables or booths and who do not customarily receive gratuities . . . ."[4] Id., § 180-6-14. With respect to diversified employment involving both service and nonservice work, the regulations provided that "[i]f service and non-service duties of an employee are interchanged, and the duties are definitely segregated and recorded, the appropriate hourly rate . . . for each type of work may be used. If service and non-service duties are interchanged, but cannot be definitely segregated or are not recorded, the non-service rate is to be applied . . . ." Id., § 180-6-1 (c), p. 5. At that time, the minimum wage was forty-five cents per hour for service employees and seventy cents for nonservice employees and those engaged in diversified employment. Id., § 180-6-1. Finally, the regulations provided that "[i]n no event shall gratuities from patrons be counted as part of the minimum wage." Id. This last rule presumably reflected the fact that gratuities were already accounted for by the fact that service employees were subject to a lower minimum wage than their nonservice counterparts.

The following year, the legislature enacted the state's first minimum wage statute. See General Statutes (Supp. 1951) § 838b. That statute authorized the commissioner to "make such administrative regulations as may be appropriate to carry out the purposes of [the] chapter" and to "provide, in such regulations, modifications of the minimum fair wage . . . for such special cases or classes of cases as the commissioner may find appropriate to prevent curtailment of employment opportunities, avoid undue hardship and safeguard the minimum fair wage . . . ." General Statutes (Supp. 1951) § 838b (b). Notably, the statute provided that the department's minimum wage regulations "*may* recognize as part of the minimum fair wage . . . gratuities . . . ." (Emphasis added.) General Statutes (Supp. 1951) § 838b (b). Accordingly, the statute initially permitted but did not require the department to recognize a tip credit against the minimum wage. General Statutes (Supp. 1951) § 839b further provided that the department's wage orders then in effect, which presumably would have included Mandatory Order Nos. 4A and 4B, would remain in full force other than as modified by the act.

In 1958, consistent with the authorization provided by General Statutes (Supp. 1951) § 838b, the department issued a revised wage order for restaurant employees that for the first time recognized that gratuities could count toward the minimum wage under certain circumstances. See Labor Dept., Mandatory Order No. 8, 21 Conn. L.J., No. 30, pp. 5–8 (November 25, 1958). The 1958 wage order contained definitions of service and nonservice restaurant employees that were similar to those included in Mandatory Orders Nos. 4A and 4B and that are substantially identical to those presently contained in § 31-62-E2 (c) and (d) of the Regulations of Connecticut State Agencies.[5] It also provided that "[g]ratuities received *by a service employee* may be allowed as part of the minimum fair wage . . . ."[6] (Emphasis added.) Mandatory Order No. 8, § 180-12-1, supra, 21 Conn. L.J., p. 5. Finally, it retained the diversified employment rule from the 1950 regulations, using language that is substantially identical to that presently contained in § 31-62-E4 of the Regulations of Connecticut State Agencies.[7]

While the department has retained its tip credit regulations without material amendment since 1958, the legislature has amended the enabling statute, § 31-60 (b), on multiple occasions since that time. Although most of those amendments simply raised the minimum wage for restaurant employees or changed the method of calculating the tip credit, two changes are noteworthy for the purposes of this appeal. First, in 1980, the legislature replaced the discretionary phrase "[the commissioner] *may* recognize, as part of the minimum fair wage, gratuities . . . for persons employed in the hotel

and restaurant industry"; (emphasis added) General Statutes (Rev. to 1979) § 31-60 (b); with the mandatory language "[the commissioner] *shall* recognize . . . ." (Emphasis added.) Public Acts 1980, No. 80-64, § 1 (P.A. 80-64). Second, in 2000, the legislature amended General Statutes (Rev. to 1999) § 31-60 (b) to provide one minimum wage for persons employed in the hotel and restaurant industry who customarily and regularly receive gratuities, and a different minimum wage for bartenders, who were referenced for the first time in the statute. See Public Acts 2000, No. 00-144, § 2 (P.A. 00-144). Following several additional amendments, the statute currently provides in relevant part: "The [commissioner] shall adopt such regulations . . . [that] shall recognize, as part of the minimum fair wage, gratuities in an amount . . . equal to [a] per cent of the minimum fair wage per hour for persons, other than bartenders, who are employed in the hotel and restaurant industry, including a hotel restaurant, who customarily and regularly receive gratuities . . . ." General Statutes § 31-60 (b) (1). The plaintiff claims that, in its present form, § 31-60 (b) requires the commissioner to issue regulations that permit a tip credit to be taken for *all* restaurant employees who customarily and regularly receive gratuities and, therefore, is incompatible with and must be understood to have repealed by implication the post-1958 regulations that limit the tip credit to service employees.

We begin our analysis of the plaintiff's claim by setting forth the standards governing judicial review of an agency decision under the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. General Statutes § 4-183 (j) provides in relevant part that "[t]he court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ." "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Dolgner* v. *Alander*, 237 Conn. 272, 280, 676 A.2d 865 (1996). Additional principles come into play, however, when an agency's interpretation of a statute is embodied in an administrative regulation.[8] *Velez* v. *Commissioner of Labor*, 306 Conn. 475, 485, 50 A.3d 869 (2012).

In *Dugas*, we considered a similar claim that a statutory amendment had repealed by implication a preexisting regulation. See *Dugas* v. *Lumbermens Mutual Casualty Co.*, supra, 217 Conn. 631. In that case, the issue was whether an uninsured motorist regulation adopted in 1975 had been repealed by implication in 1980, when the legislature amended a related statute. Id., 638–39. In concluding that the amended statute had not repealed by implication the preexisting regulation, this court looked to four primary considerations. Id., 641–48.

First, this court relied on the well established rule that regulations issued by an administrative agency are presumed to be valid and have the same force and effect as a statute. Id., 641; see also *Velez* v. *Commissioner of Labor*, supra, 306 Conn. 485. For this reason, we explained, "the rule disfavoring the implied repeal of a statute by the subsequent enactment of another statute also applies to the implied repeal of a regulation by a statute . . . ." *Dugas* v. *Lumbermens Mutual Casualty Co.*, supra, 217 Conn. 641; accord *Lumbermens Mutual Casualty Co.* v. *Huntley*, 223 Conn. 22, 30 n.11, 610 A.2d 1292 (1992). We also relied on the principle that "a state statute should be construed as having preempted a local ordinance only when the legislature has demonstrated its intent to regulate the entire field or when the ordinance is in irreconcilable conflict with the statute." *Dugas* v. *Lumbermens Mutual Casualty Co.*, supra, 641 n.11. We thus proceeded on the assumption that if a statute and a regulation are potentially in conflict but can reasonably be read to be consistent with each other, the court should construe them so as to give effect to both. See id., 641.

Second, we recognized that "[i]f a regulation has been in existence for a substantial period of time and the legislature has not sought to override the regulation, this fact, although not determinative, provides persuasive evidence of the continued validity of the regulation." Id., 642. In *Dugas*, in reviewing the evolution of the statutory scheme at issue, we found significant evidence of legislative acquiescence. Specifically, the legislature had amended the authorizing statute six times over the course of a decade without ever expressly preempting the regulation at issue. Id.

Third, we noted that "[i]n the construction of statutes, great deference is to be accorded to the construction given the statute by the agency charged with its enforcement." (Internal quotation marks omitted.) Id., 643. Noting that the Insurance Commissioner has a "very broad grant of regulatory authority in filling in the interstices of the uninsured and underinsured motorist coverage legislation," we thus credited the Insurance Commissioner's determination that the regulation and statute at issue were not incompatible. (Internal quotation marks omitted.) Id.

Fourth, in *Dugas* this court identified as a "critical factor" the fact that the public policy underlying the statutory amendment was fully compatible with continued enforcement of the preexisting regulation. Id., 643–44. Concluding that the plain language of the statute did not require abrogation of the regulation, we reviewed the legislative history of the statutory amendment and found no indication that the legislature had intended to repeal the regulation thereby. Id., 644–47.

Turning our attention to the present case, we conclude that each of the *Dugas* factors counsels in favor of deference to the department's interpretation of § 31-60 (b) and supports the conclusion of the trial court that the 1980 amendment thereto did not repeal by implication the department's long-standing tip credit regulations. See P.A. 80-64. First, with respect to the presumptive validity of regulations that do not conflict irreconcilably with a statute, we agree with the department that § 31-60 (b), as amended, need not be read to conflict with § 31-62-E1 et seq. of the Regulations of Connecticut State Agencies. Those regulations (1) draw a distinction between service and nonservice employees, (2) disallow a tip credit for nonservice employees, and (3) provide that restaurant employees who engage in both service and nonservice duties may be subject to a tip credit on the service portion, but only insofar as time spent on the two types of duties is properly segmented and recorded. The statute, by contrast, simply requires that the commissioner adopt regulations that "recognize, as part of the minimum fair wage, gratuities . . . for persons, other than bartenders, who are employed in the hotel and restaurant industry . . . who customarily and regularly receive gratuities . . . ." General Statutes § 31-60 (b).

We have explained that a regulation that "properly subjects what the legislature has authorized to additional requirements" does not thereby "forbid that which the legislature has expressly authorized." (Internal quotation marks omitted.) *Rocky Hill* v. *SecureCare Realty, LLC*, 315 Conn. 265, 297, 105 A.3d 857 (2015); accord *Phelps Dodge Copper Products Co.* v. *Groppo*, 204 Conn. 122, 135, 527 A.2d 672 (1987); *Ahearn* v. *Inland Wetlands Agency-Conservation Commission*, 34 Conn. App. 385, 392, 641 A.2d 812, cert. denied, 230 Conn. 911, 645 A.2d 1015 (1994). Here, § 31-60 (b) does not expressly abrogate or even address the department's long-standing distinction between service and nonservice work. The statute does not expressly require that the tip credit be made available for *all* restaurant workers who customarily and regularly earn gratuities. Accord *State* v. *White*, 204 Conn. 410, 422, 528 A.2d 811 (1987). Nor does it spell out exactly how the tip credit is to be applied to employees who spend only part of their workday engaged in duties that customarily and regularly provide the opportunity to earn gratuities.

Accordingly, it was reasonable for the department to conclude that the legislature did not intend that employees such as delivery drivers, who have the potential to earn gratuities during only a small portion of their workday, would be subject to a reduction in their minimum wage with respect to time spent traveling to a customer's home and other duties for which they do not earn gratuities.[9]

Moreover, the statutory language reasonably can be read to delegate to the department the authority to carve out exceptions to the tip credit in order to accomplish the remedial purpose of the minimum wage law, which is to "require the payment of fair and just wages." *West* v. *Egan*, 142 Conn. 437, 442, 115 A.2d 322 (1955). Section 31-60 (b) begins by authorizing the commissioner to "adopt such regulations . . . as may be appropriate to carry out the purposes of [the minimum wage statutes]." It concludes by providing that "[t]he commissioner may provide, in such regulations, modifications of the minimum fair wage herein established . . . for such special cases or classes of cases as the commissioner finds appropriate to prevent curtailment of employment opportunities, avoid undue hardship and safeguard the minimum fair wage herein established. . . ." General Statutes § 31-60 (b). Accordingly, we conclude that it is at least ambiguous whether the legislature, in amending § 31-60 (b) in 1980, intended to repeal the department's long-standing distinction between service and nonservice workers and to revoke the department's discretion to carve out appropriate exceptions to the tip credit. In light of this ambiguity, *Dugas* counsels that we should attempt to construe the statute and the regulation so as to give effect to both.[10] See *Dugas* v. *Lumbermens Mutual Casualty Co.*, supra, 217 Conn. 641. The department's resolution of the case accomplishes that goal.

Turning our attention to the second *Dugas* factor, legislative acquiescence, we agree with the department that there is strong evidence that the legislature has acquiesced in the department's long-standing tip credit rules. As noted, the department's minimum wage regulations have differentiated between service and nonservice restaurant industry employment since 1950, and §§ 31-62-E2 and 31-62-E4 of the Regulations of Connecticut State Agencies have existed in essentially their present form since 1958. Since the legislature made the tip credit mandatory in 1980, the department has continued to apply its regulations so as to disallow the tip credit for nonservice employees, even those who customarily and regularly receive gratuities. See *Back Bay Restaurant Group, Inc.* v. *Dept. of Labor*, Superior Court, judicial district of New Britain, Docket No. CV-00-0504360-S (August 14, 2001) (30 Conn. L. Rptr. 264, 268) (parties did not dispute that, under department's interpretation of regulation, "[n]o recognition or credit toward the minimum fair wage may be taken with

respect to gratuities received by a non-service employee"); *Labor Dept.* v. *America's Cup*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-92-0516750 (April 21, 1994) (11 Conn. L. Rptr. 379) (similar); see also *Bucchere* v. *Brinker International, Inc.*, Superior Court, judicial district of Waterbury, Docket No. X01-CV-044000238-S, 2006 WL 3361403, *4–5 (November 8, 2006) (discussing regulations and department's published explanation thereof). During that time, the department also has published instructional materials that clearly delineate how it applies the credit to food service workers.[11] In addition, the department's application and enforcement of the tip credit regulations has on at least two occasions been challenged in the Superior Court. See *Back Bay Restaurant Group, Inc.* v. *Dept. of Labor*, supra, 264; *Labor Dept.* v. *America's Cup*, supra, 379.

At the same time, the legislature has amended § 31-60 (b) no fewer than ten times since 1980. See Public Acts 1999, No. 99-199; P.A. 00-144; Public Acts 2001, No. 01-42, § 2; Public Acts 2002, No. 02-33, § 2; Public Acts 2003, No. 03-278, § 91; Public Acts 2004, No. 04-68, § 1; Public Acts 2008, No. 08-113, § 1; Public Acts 2013, No. 13-117, § 2; Public Acts 2013, No. 13-140, § 14; Public Acts 2014, No. 14-42, § 5. The parties appear to agree, and we will assume for the sake of argument, that the amendments enacted between 2000 and 2002, which specified for the first time that a tip credit can be taken for bartenders as well as for waitstaff, were adopted in response to the decisions in *Back Bay Restaurant Group, Inc.*, and *America's Cup*. We find it significant that, at the time that the legislature amended the statute to make clear that bartenders are subject to the tip credit; see P.A. 00-144; the legislature did not expressly preempt the department's long-standing distinction—discussed throughout those decisions—between service and nonservice employees, nor the department's rule that only the former are subject to the tip credit. See *Dugas* v. *Lumbermens Mutual Casualty Co.*, supra, 217 Conn. 642; see also *Velez* v. *Commissioner of Labor*, supra, 306 Conn. 492 ("[w]e may assume that if . . . the legislature had disagreed with the commissioner's interpretation of [the statute] . . . it would have taken appropriate corrective action at [the] time [of amendment]"). The inference that the legislature has acquiesced in the department's ongoing enforcement of its tip credit regulations is especially strong in light of the fact that, in 2014, the legislature repealed thousands of pages of "unnecessary" Connecticut regulations, including § 31-62-E6 of the Regulations of Connecticut State Agencies (allowing cost of food and lodging provided to restaurant and hotel employees to be factored into calculation of minimum wage) and § 31-62-E7 of the Regulations of Connecticut State Agencies (restriction on deductions made against minimum wage rate for employers of restaurant and hotel

workers), but left undisturbed the immediately preceding §§ 31-62-E1 through 31-62-E4 of the Regulations of Connecticut State Agencies that are at issue in this case. See 2014 Public Acts, No. 14-187, § 54. We must assume that that choice was intentional and that, by repealing the department's regulations providing allowances for boarding and lodging but retaining those that distinguish between service and nonservice restaurant employees, the legislature signaled its implicit approval of the tip credit regulations. See *Phelps Dodge Copper Products Co.* v. *Groppo*, supra, 204 Conn. 134; *Connecticut Light & Power Co.* v. *Public Utilities Control Authority*, 176 Conn. 191, 198, 405 A.2d 638 (1978).

Turning our attention to the third *Dugas* factor, we note that the statutory regime at issue here is akin to that in *Dugas* in that the legislature has granted the department broad authority to interpret and apply the law so as to accomplish the statutory purpose of ensuring the payment of fair and just wages to all employees. We have long recognized the substantial discretion afforded to the department in this respect. See *West* v. *Egan*, supra, 142 Conn. 444–45; see also *Back Bay Restaurant Group, Inc.* v. *Dept. of Labor*, supra, 30 Conn. L. Rptr. 267 (noting "broad delegation of power" to commissioner to issue regulations applying tip credit). We recognize that the legislature's insertion of mandatory language during the 1980 amendment of § 31-60 (b) cabined this discretion to some extent. See P.A. 80-64. Still, as we have discussed, the statute continues to authorize the commissioner to "adopt such regulations . . . as may be appropriate to carry out the purposes of [the law] . . . [and to] provide, in such regulations, modifications of the minimum fair wage . . . for such special cases or classes of cases as the commissioner finds appropriate to prevent curtailment of employment opportunities, avoid undue hardship and safeguard the minimum fair wage . . . ." General Statutes § 31-60 (b). Moreover, General Statutes § 31-58 (b) provides that, in establishing a minimum fair wage, the commissioner "(1) may take into account all relevant circumstances affecting the value of the services rendered, including hours and conditions of employment affecting the health, safety and general well-being of the workers, (2) may be guided by such considerations as would guide a court in a suit for the reasonable value of services rendered where services are rendered at the request of an employer without contract as to the amount of the wage to be paid, and (3) may consider the wages, including overtime or premium rates, paid in the state for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards . . . ." The plaintiff has suggested no reason why the commissioner's long-standing authority to modify the minimum wage rules[12] for special classes of cases would not extend to pizza delivery drivers, who represent a unique subset of restaurant

service workers that did not even exist at the time that the tip credit regulations were initially adopted.[13]

Finally, we turn our attention to the fourth *Dugas* factor, namely, the legislative history of the relevant statute. Because we have concluded that § 31-60 (b) is ambiguous with respect to whether the legislature intended, after 1980, to permit the department to continue to limit the tip credit to those restaurant employees engaged solely in table service duties, we may look to the legislative history of the statute for additional guidance. See General Statutes § 1-2z.

The history of § 31-60 (b), although not dispositive, reveals that legislators considering amendments to the statute consistently have suggested that the mandatory tip credit applies specifically to waitstaff. When the House of Representatives debated the 1980 amendment, for example, Representative Richard J. Balducci explained that the bill would impose a percentage formula in place of "the sixty cents [tip credit] which had previously been the method of removal on wages for waitresses." 23 H.R. Proc., Pt. 3, 1980 Sess., p. 865. On the Senate side, Senator Michael J. Skelley stated that the bill "takes away the flat [sixty] cent[s] allowance that is currently deducted from the minimum wage for waitresses and increases that to 23 percent of the minimum wage." 23 S. Proc., Pt. 3, 1980 Sess., p. 734. Similarly, when summarizing the 2002 amendments, Representative Christopher G. Donovan stated: "The bill also includes the current tip credit amount for those who customarily and regularly receive tips, which includes waiters, waitresses and bartenders." 45 H.R. Proc., Pt. 4, 2002 Sess., pp. 1139–40. Representative Donovan further explained: "[T]here is a tip credit that employers can use in calculating the minimum wage for those people—waiters, waitresses and bartenders— and in talking to the Office of Legislative Research we thought to clear up any confusion over waiters, waitresses and bartenders that we make the language to be consistent. So the language which we changed [applies] to the waiters and waitresses the same language that we have for bartenders . . . ." Id., pp. 1140–41.

The plaintiff posits that these "[p]assing" legislative references to " 'waiters and waitresses' " are merely the shorthand by which legislators have referred to restaurant employees who regularly and customarily receive tips, and that the references do not indicate a legislative intent to adopt the department's regulations or to limit the scope of the tip credit to employees who provide table service. We are not persuaded. Although such a gloss might be placed on the comments of Representative Balducci and Senator Skelley, additional comments by Representative Donovan strongly suggest that the legislature was familiar with and chose not to preempt the department's traditional tip credit rules. Specifically, in response to a follow-up question,

Representative Donovan elaborated: "[W]e have two sections of people who receive tips waiters and waitresses people in the hotel and restaurant industry, and bartenders. We have the language for waiters and waitresses has been around for some [fifty] years, it didn't use the words customarily and regularly receive tips though that is certainly the understanding that is what the regulations call for, that's what we use. When the bartenders were added we put that language in and legislative research thought there was some confusion there, we wanted to clarify it. We're talking about the same group of people." 45 H.R. Proc., supra, pp. 1141–42. Although they are not completely linear, we understand Representative Donovan's comments to mean that the members of the Labor and Public Employees Committee that he chaired (1) were familiar with the tip credit regulations that had been in place since the early 1950s, (2) understood that the department had applied the tip credit solely to waiters and waitresses prior to the statutory extension of the credit to bartenders in 2000, and (3) in amending the statute, merely sought to clarify that waitstaff and bartenders were to be treated alike.[14] To that extent, the legislative history bears out the department's interpretation of the statute.

For the foregoing reasons, we conclude that the 1980 amendment to § 31-60 (b) did not repeal by implication the department's tip credit regulations as applied to restaurant workers, other than waitstaff and bartenders, who regularly and customarily receive gratuities, and that the department did not act arbitrarily, capriciously, or in violation of its statutory authority in declining the plaintiff's invitation to apply the tip credit to delivery drivers.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The commissioner also stated that "the mere location to which such food items are delivered has less meaningful legal significance to this analysis than the nature of the 'service' being provided by such employees." The plaintiff argues that the department's interpretation and application of its regulations are entitled to less deference because the department has enforced the regulations inconsistently, abandoning the requirement that service employees serve customers at a table or booth. Because we read the decision of the commissioner to have deemphasized but still retained the significance of table and booth service with respect to whether a particular restaurant employee qualifies as a service employee, we are not persuaded by the plaintiff's argument.

[2] Although the commissioner cited to § 31-62-E4 of the Regulations of Connecticut State Agencies, which addresses diversified service/nonservice employment within the restaurant industry, she did not discuss the relevance of that regulation in her analysis of the plaintiff's petition. Section 31-62-E4 provides: "If an employee performs both service and non-service duties, and the time spent on each is definitely segregated and so recorded, the allowance for gratuities as permitted as part of the minimum fair wage may be applied to the hours worked in the service category. If an employee performs both service and non-service duties and the time spent on each cannot be definitely segregated and so recorded, or is not definitely segregated and so recorded . . . no allowances for gratuities may be applied as part of the minimum fair wage." Although the commissioner did not expressly apply this regulation to the plaintiff's case, it is implicit in the commissioner's ruling that, even if the plaintiff could overcome the fact

that only table and booth service qualifies for a tip credit and that delivery drivers do not provide such service, the plaintiff could not claim a tip credit for the limited time during which its drivers are actually "serving" food to their customers because the plaintiff does not segregate delivery time from driving time.

[3] Substantially similar regulations adopted at that time applied to adult males employed in restaurant occupations. See Dept. of Labor and Factory Inspection, Mandatory Order No. 4B, § 180-7-1, 16 Conn. L.J., No. 73, p. 7 (March 28, 1950). For purposes of brevity, we cite hereinafter only to the relevant provisions of Mandatory Order No. 4A.

[4] A corresponding provision used the terms "countermen [and] counterwaiters." Mandatory Order No. 4B, § 180-7-14, 16 Conn. L.J., supra, p. 8. At that time, a "counterman" was defined as "one that serves food over the counter of a cafeteria or lunchroom . . . ." Webster's Third New International Dictionary (1961) p. 519.

[5] Section 180-12-6 of Mandatory Order No. 8 defines service employee as "any employee whose duties relate solely to the serving of food and/or beverage to patrons seated at tables or booths, and to the performance of duties incidental to such service, and who customarily receives gratuities. For the purpose of this [o]rder, a person shall not be considered to customarily receive gratuities unless a minimum of [$10] per week in gratuities is received in the case of full time employees, o[r] [$2] per day in the case of part time employees, as evidenced by signed statements of the employee, stating unequivocally that such worker did receive gratuities as herein required, which must be maintained as part of the records of the employer." Mandatory Order No. 8, § 180-12-6, supra, 21 Conn. L.J., p. 6.

Section 180-12-7 of Mandatory Order No. 8 defines a nonservice employee as "an employee other than a service employee, as herein defined. A nonservice employee shall include, but is not limited to, countergirls, counterwaitresses, countermen, counterwaiters and those employees serving food or beverage to patrons seated at tables or booths and who do not customarily receive gratuities as defined above." Id., § 180-12-7.

[6] The original reference to service employees appears to have been inadvertently omitted from the present version of the regulation, which defines the conditions under which gratuities may be counted against the minimum wage of a restaurant employee. See Regs., Conn. State Agencies § 31-62-E3. It is undisputed, however, that the intent of the regulatory scheme is that only service employees shall be subject to the tip credit.

[7] Section 180-12-3 of Mandatory Order No. 8 provides: "If an employee performs both service and non-service duties, and the time spent on each is definitely segregated and so recorded, the allowance for gratuities as permitted as part of the [m]inimum [f]air [w]age may be applied to the hours worked in the [s]ervice category. If an employee performs both service and non-service duties and the time spent on each cannot be definitely segregated and so recorded, or is not definitely segregated and so recorded, no allowances for gratuities may be applied as part of the [m]inimum [f]air [w]age." Mandatory Order No. 8, § 180-12-3, supra, 21 Conn. L.J., p. 5.

[8] Many of the authorities cited by the parties are not directly relevant to the question presented to us because they do not address an alleged conflict between an administrative regulation and an authorizing statute.

[9] The plaintiff contends that a driver who transports a pizza from the restaurant to a customer's home is performing essentially the same service as a waiter who carries food from the restaurant kitchen to a customer's table and, therefore, that the department erred in concluding that only a small portion of the driver's time is spent engaged in tip earning service work. By contrast, the department, whose wage regulations distinguish between travel time and working time; see Regs., Conn. State Agencies § 31-62-E10; is apparently of the view that pizza delivery is more akin to other types of work in which an employee drives to a customer's location and then performs a discrete service there. Regardless of which analogy we might find more apt were we to consider the question in the first instance, we recognize that in this arena we must defer to the agency's determinations, which are not unreasonable. See *Pet* v. *Dept. of Health Services*, 228 Conn. 651, 660–61, 638 A.2d 6 (1994).

[10] We recognize that the presumption in favor of the validity of the regulation challenged in *Dugas* was especially strong because that regulation had been approved by the standing Legislative Regulation Review Committee of the General Assembly. See *Dugas* v. *Lumbermens Mutual Casualty Co.*, supra, 217 Conn. 641; see also General Statutes § 4-170 (b) (1) (providing that no adoption, amendment, or repeal of any regulation shall be effective

until approved by that committee). Nevertheless, we have made clear that the presumption of validity extends to regulations, such as those at issue in the present case, that were adopted prior to the enactment of the UAPA in 1971, and thus were not subject to committee approval. See, e.g., *Hartford Electric Light Co.* v. *Sullivan*, 161 Conn. 145, 154, 285 A.2d 352 (1971) ("[a]dministrative rules and regulations are given the force and effect of law"); *St. John's Roman Catholic Church Corp.* v. *Darien*, 149 Conn. 712, 722, 184 A.2d 42 (1962) ("we must make every presumption and intendment in favor of the regulations and sustain them unless they are clearly invalid"); see also Public Acts 1971, No. 71-854, §§ 7 (a) and 8 (a) (authorizing publication of regulations preexisting establishment of regulation review committee).

[11] The department published its guidelines in booklet form. See Connecticut Dept. of Labor, Wage and Workplace Standards Division, "A Guide for Restaurant Employers in Connecticut" (1997) (Guide). The Guide informed employers that "restaurants may take a credit toward the minimum wage for some service employees who receive gratuities. A 'service employee' is defined as any employee whose duties relate *solely* to the serving of food and/or beverages to patrons seated at *tables or booths*, and to the performance of duties incidental to such service, and who customarily receives gratuities. This means that a tip credit (toward the minimum wage) can be taken only for *waiters and waitresses*, and only during the time for which they are actually serving patrons at tables or booths, or performing closely related duties, and when they are receiving gratuities." (Emphasis in original.) Id., p. 2. The Guide proceeded to delineate the sorts of restaurant duties that qualify as service and nonservice duties. Id., pp. 2–3. Of particular note, the Guide listed "[w]aiting on takeout customers" as a nonservice duty for which no tip credit may be taken. Id., p. 3. The department apparently ceased publication of that particular booklet in 2006.

In light of this published guidance, the plaintiff's contention that the department's tip credit policies are not entitled to deference because they are "unwritten" is unavailing. Although it is true that the department had not formally applied its rules to pizza delivery drivers prior to the present case, we conclude that the Guide, by restricting the tip credit to waiters and waitresses serving patrons at tables and booths, and by expressly disallowing the credit for takeout service, clearly presaged the department's position that delivery drivers are not engaged solely in service work. To the extent that the trial court found that the department never had a written policy of applying the tip credit only to service employees, we conclude, in light of the Guide, that that finding was clearly erroneous.

[12] We emphasize that any actual changes to the department's regulations may be proposed by the commissioner but must be approved by the Legislative Regulation Review Committee of the General Assembly. See General Statutes § 4-170.

[13] See A. Smith, Encyclopedia of Junk Food and Fast Food (Greenwood Press 2006) pp. 45, 78 (recounting that Chicken Delight, founded in 1952, was first chain to offer home delivery service and that Domino's, which was founded in 1960, offered nation's first pizza delivery service). At oral argument, the plaintiff acknowledged that there was no pizza delivery service in Connecticut when § 31-60 (b) and the tip credit regulations were initially drafted in the early 1950s.

[14] Also noteworthy are the 2013 comments of Representative Daniel E. Carter, who expressed his opposition to further increasing the minimum wage. See 56 H.R. Proc., Pt. 22, 2013 Sess., pp. 7447–49. Representative Carter began at one point to suggest that a higher minimum wage would pose problems for business owners who employ "waitresses," but quickly corrected himself, presumably recognizing that the tip credit mitigates the impact of a higher minimum wage with respect to waitstaff. Instead, Representative Carter stated: "We're talking about when somebody might be a pizza guy. Well, it's going to be a lot more difficult for somebody to hire an extra pizza delivery guy when you're going to be paying a higher minimum wage . . . ." Id., p. 7748. In the mind of at least one legislator, then, the tip credit required by statute did not apply to pizza delivery drivers.